Robert A. FISHER
v.
UNITED STATES of America.

UNITED STATES of America
v.
BERKS STEEL SERVICE, INC.
and
George M. Brewster & Son, Inc.

GEORGE M. BREWSTER & SON, INC.
v.
H. I. LEWIS CONSTRUCTION CO., Inc.
Civ. A. No. 31345.

United States District Court
E. D. Pennsylvania.
April 23, 1969.

John R. McConnell, Philadelphia, Pa., for Robert A. Fisher.

Joseph R. Ritchie, Jr., Philadelphia, Pa., for United States.

Lynn L. Detweiler and Grahame P. Richards, Jr., Philadelphia, Pa., for Berks Steel Service, Inc.

Benjamin F. Stahl, Jr., Philadephia, Pa., for George M. Brewster & Son, Inc.

Michael E. Quinlan, Philadelphia, Pa., for H. I. Lewis Const. Co., Inc.

FINDINGS OF FACT, CONCLU-
SIONS OF LAW, AND ORDER

JOHN W. LORD, Jr., Chief Judge.

After full consideration of the evidence presented at trial as well as the affidavits submitted by the parties in connection with the motion of Berks Steel Service, Inc., under Rule 59 of the Federal Rules of Civil Procedure to reopen the record for the presentation of newly discovered evidence, the Court makes the following

FINDINGS OF FACT

1. On or about June 22, 1960, at or about 3:10 P.M., Eastern Daylight Saving Time, plaintiff, while in the employ of Berks Steel Service Corporation of Coatesville, Chester County, Pennsylvania, as a steelworker, was lawfully working upon the premises commonly referred to as Kettle Creek Dam Project, a United States flood control dam project, at or near the Borough of Renovo, Clinton County, Pennsylvania. Plaintiff was a business invitee of the Government on that property.

2. Said premises are now and were at the time aforesaid owned by, and in the possession of, the defendant United States.

3. The aforesaid dam project was designed by the defendant United States.

4. The United States through the United States Army Corps of Engineers awarded a contract for the complete construction of the dam to the George M. Brewster & Son, Inc. This contract was designated as Contract No. DA–18–020–CIVENG–59–34.

5. The bulk of the concrete work to be performed under the Government contract was subcontracted by George M. Brewster & Son, Inc. (hereinafter referred to as "Brewster") to the H. I. Lewis Construction Co., Inc. (hereinafter referred to as "Lewis").

6. Lewis subcontracted the supporting structural steel work required in the pouring of concrete to Berks Steel Serv-ice, Inc. (hereinafter referred to as "Berks").

7. The plaintiff, at the time of his injury, was employed by Berks, and he was in the performance of work under the Berks subcontract with Lewis at the time of his injury.

8. On June 22, 1960, the water intake portion of the flood control dam was in the early stages of construction. This area later would be under water and have the function of allowing water to enter into a large tunnel and escape downriver in times of heavy rainfall.

9. To regulate the flow of water into the tunnel the plans provided for the construction of three tunnel-like inlets controlled by separate gates. Prior to the date of the accident, a huge concrete slab had been completed at the base of the dam. Upon this slab, wall-like structures were to be constructed in concrete so that the three inlets described above would have sides.

10. About noon on June 22, 1960, the plaintiff was inside a ten-foot high wooden form which was to be used for one of the walls above described. The form was approximately four feet wide at the point where the accident occurred. It had been erected previously by Lewis.

11. This wooden form held its shape by being pulled together by steel tie rods and held apart by wooden spreaders. The spreader was nailed to each side of the form by two nails. It had been installed by Lewis and was not intended to bear weight.

12. When concrete is poured inside such forms the spreaders (in the case at hand two inch by six inch boards of a length of approximately four feet) are removed when the concrete is poured.

13. The plaintiff on June 22, 1960, was tying and untying reinforcement steel within the walls of the concrete form previously described when he stepped upon a spreader board, using it as a platform. This spreader broke loose from one side of the form and the plaintiff fell to the concrete slab below, strik-

ing his left ankle on some of the reinforcement steel at the concrete slab level.

14. The spreader board was properly secured in its place for the purpose for which it was used, i. e., maintaining the form's shape.

15. The defendant United States maintained a safety program for the benefit of the plaintiff and other construction workers at its Kettle Creek Dam Project.

16. Mr. Weaver was resident engineer for the Government at Kettle Creek Dam. He was in general charge of the construction and his duties involved generally looking after the work to see that it was built in accordance with the contract requirements and general supervision of the Government inspection force.

17. The men assigned to work as inspectors generally looked for conditions around the job to assure themselves that the general safety conditions were being followed and that there was an observance of safe working practices. Mr. Weaver required the contractor to furnish him with a safety plan and it was within his authority to require the contractor to include safety regulations in that plan. Thus, Mr. Weaver exercised a substantial amount of supervision over safety practices at the Dam site.

18. The inspectors had the duty to see to it that the work was done in accordance with the specifications and also that there were no violations of safety precautions. They actually did note and report dangerous conditions relating to loose rock, sagging electric wires and other such matters. It was the practice of the Government Inspectors if they saw a dangerous condition or practice to warn the man or men involved and their supervisor.

19. The defendant United States had inspectors in the tunnel in-take area on June 22, 1960, the day of the accident. Those inspectors were Mr. Robert R. Merritt and Mr. Henry Hurtt. These inspectors knew that it was unsafe to stand on spreaders. They were on the scene daily, and issued safety directions to those working there on numerous occasions.

20. Mr. Merritt was in the vicinity of the tunnel in-take structure before and after the accident. Mr. Hurtt was in the vicinity of the tunnel in-take structure both before and after the accident.

21. Mr. Merritt, who was observed by plaintiff prior to the accident in the area where the accident occurred, had the duty of inspecting for safety purposes. If he saw an unsafe practice, he would contact the foreman and ask him to correct it.

22. No official of the defendant United States warned the plaintiff not to step on the spreaders.

23. Mr. Weaver knew that on occasions subcontracting companies would hire inexperienced personnel.

24. Mr. Weaver, as Director of the Safety Program, took no precaution with respect to warning inexperienced employees or causing them to be warned of the dangers of stepping on a spreader.

25. In the assurances Mr. Weaver required of and received from the prime contractor with respect to safety and safety indoctrination of employees, there was no reference to stepping on spreaders.

26. The defendant United States had reason to know that there were workmen who made a practice of stepping on spreaders at the job site.

27. Plaintiff was injured because of the Government's failure to protect him against the danger that existed.

28. The plaintiff did not complete the 8th grade in grammar school. When he left school, he was a farm boy and did farm work until he was 16 at which time he started work in a road crew with a pick and shovel. Then he went back to the farm for a while. Thereafter, he did miscellaneous labor, banding rolls of steel, working in foundries, occasionally returning to farming, and working in a bakery plant. In 1960 he went to work for the State Highway Department

**8**

mowing grass. Then he was offered the job when he had the accident out of which this suit arises. Thus, plaintiff was inexperienced in working at such job sites and did not know of the danger of walking on spreaders; rather, he assumed it to be a safe practice since he observed other workmen walking on the spreaders. He had only been working on this construction two days prior to the day of the accident.

29. To the extent that he saw forms before the accident, plaintiff could not see how the walls were held in place and he did not know anything about spreaders.

30. The plaintiff saw other workmen, including carpenters and other employees, walking on the spreaders during the course of his employment and prior to the accident. He did not see any Government inspectors stand on a spreader, however.

31. At no time prior to the accident did anyone ever tell plaintiff not to step on a spreader.

32. Under the prime contract between the defendant Government and Brewster, the latter agreed that it would comply with all pertinent provisions of a Corps of Engineers Manual and that compliance with the Manual by subcontractors would be the responsibility of Brewster.

33. One of the provisions of the Manual was "that each employee should be provided initial indoctrination and such continuing instruction as will enable him to conduct his work in a safe manner."

34. Defendant Brewster did nothing to prevent the plaintiff and others from using the wooden spreaders constructed for the bracing of concrete forms as platforms, scaffolds or ladders while working above the surface of a concrete slab base.

35. The provisions of the Corps of Engineers Manual that each employee should be provided such initial indoctrination and continuing instruction as would enable him to conduct work in a safe manner was not complied with by Brewster and Brewster did not take adequate steps to see that Berks complied with that provision.

36. Indoctrination of plaintiff as to how to perform the work in a safe manner within the forms should have included a warning not to step on or walk upon spreader boards within the forms.

37. The contract between Brewster and Lewis

1. Incorporated by reference all terms and conditions of the United States—Brewster contract, plans and specifications, including the requirement of compliance with Corps of Engineering Manual EM–38511. (page 1 and Article 10, pages 3 and 4 of Brewster-Lewis contract, Exhibit G 10).

2. Expressly provided for indemnification of Brewster by Lewis. (Article 10, pages 3 and 4 of Brewster-Lewis contract, Exhibit G 10).

38. The only written memorandum relevant to the contractual relationship between Lewis and Berks whereby Berks agreed to handle the structural steel work was a "Purchase Order" which did not incorporate by reference the indemnity provisions of the prime contract. There was no further understanding between these parties by which the indemnity provisions of the prime contract would be incorporated in the contractual relationship between them.

39. The third-party defendant, Berks, through its foreman, Charles B. Varner, and others, set up and initiated the procedure for doing the work in which the plaintiff was engaged at the time of his injury.

40. Mr. Varner had seen people on the job at Kettle Creek in the in-take area step on spreaders prior to this accident. They were laborers.

41. Berks knew that the plaintiff was inexperienced in working in concrete forms and unfamiliar with and uninformed of the nature of their component parts.

42. Berks permitted plaintiff and others to use wooden spreaders construct-

ed for the bracing of concrete forms as platforms, scaffolds or ladders while working above the surface of a concrete base slab.

43. Berks failed to properly and adequately instruct the plaintiff as to the safe and prudent manner of performing his work, and in particular as to the use of the spreaders.

44. After plaintiff fell, he was removed from the form and taken by Mr. Oswalt (a fellow worker) in the latter's car to a hospital at Renovo.

45. After two and one half days, his friends took him from the Renovo Hospital to his home in Reading, where he was treated by Dr. Yund.

46. He first went into the Reading Hospital in September of 1960. At that time a cast was put on his ankle. With that cast he could walk with crutches and he had the cast on about six or seven weeks.

47. The cast did not improve his condition and his leg was extremely painful.

48. After the first cast was removed on July 15, 1960, plaintiff went back to work for four or five hours. An elastic bandage was applied to his leg when the cast was removed. His task at work at this time was to carry steel, basically the same type of work he had done prior to the accident.

49. Subsequent to July 15, plaintiff's foot kept swelling and he had such pain that he could not continue working. He returned to the Reading Hospital. At that time Dr. L. C. Yund, plaintiff's doctor at the hospital, recommended a leather ankle support, and plaintiff acquired such a support.

50. On August 25, when plaintiff returned to the hospital after experiencing continued pain, further x-rays revealed tearing of the calcanco-fibular ligament and the anterior talo fibular ligament. The function of both of these ligaments is to give stability to the ankle joints.

51. Dr. Yund recommended surgery on September 5, 1960. The operation took place on September 6, 1960, and plaintiff remained in the hospital until September 10. Through an incision in the left thigh, connective tissue called "fascia lata" was taken from the thigh and interwoven where the ligaments were torn in plaintiff's ankle. The removal of tissue from the thigh caused the thigh muscles to protrude somewhat. The surgical repairs used included the drilling of holes through certain bones in the plaintiff's leg.

52. Subsequent to the above operation, redness, swelling and pain developed in the area of the surgery. There was also substantial drainage about the left ankle. Plaintiff was readmitted to Reading Hospital January 9, 1961 and remained until January 23, 1961. At that time plaintiff was given therapy in the form of whirlpool treatments and hot packs. A culture from the drainage revealed an infection. Surgery was performed on January 18, 1961 to free the sural nerve, which had been pinched by scar tissue from the previous operation, causing great pain. The surgery also included use of the one remaining tendon to reinforce the previous repair.

53. Plaintiff was readmitted to Reading Hospital on June 2, 1961 as a result of shooting pains he had experienced and yellow purulent drainage which had developed due to cellulitis of the ankle, a diffuse infection. Plaintiff was treated with continuous hot packs of water, and enzyme ointment was used to get rid of the dead tissue which was present. Plaintiff was discharged from the hospital on June 10, 1961.

54. Plaintiff was again admitted to Reading Hospital on April 23, 1962 as a result of further severe pain and development of more purulent material due to continued infection in the left ankle. As a result of this infection, a pedicle graft from the right thigh was required. The first stage of the surgery was performed on April 25, 1962. This stage involved raising a tube or flap of skin from the plaintiff's right thigh. One end of this flap was then attached to plaintiff's left ankle while the other end remained attached to his right thigh. In order to allow this surgical repair to

be performed, plaintiff's legs had to be crossed and he had to be placed in an immovable cast with his right thigh and left ankle connected as indicated above. Plaintiff had to remain in the immovable cast in this position with his left ankle against his right thigh for a period of about three weeks. He was discharged from the hospital on May 18, 1962.

55. Plaintiff is still being treated for his injuries. He wears a metal brace on his left ankle and walks with a pronounced limp.

56. The plaintiff has incurred medical expenses to date in the amount of $4409.56 and still requires additional treatment. The amount of these expenses is undisputed.

57. Plaintiff's work record prior to the accident was irregular and included farm work, pick and shovel work, banding rolls of steel, foundry work, work at a bakery, and work mowing grass for periods of varying duration. No evidence of the amount of plaintiff's earnings during that period was presented at trial. Plaintiff was earning $4.08 per hour at Berks Steel Service, Inc. at the time of the accident, but was only in his third day of employment with Berks Steel Service, Inc. when injured. Taking into account plaintiff's spotty work record and the fact that plaintiff presented such limited evidence of prior earnings, the Court estimates plaintiff's average earning capacity for the purpose of determining past and future wage loss at $3,000.00 per year.

58. The accident occurred on June 22, 1960. Plaintiff's expected earnings for the 8⅓ years through the time of trial, computed on the basis of $3,000.00 per year, was $25,000.00. Plaintiff earned $2,200.00 during that period. Therefore plaintiff's past wage loss is $22,800.00.

59. Plaintiff is 37 years old and has approximately 27 working years remaining based on "Table of Working Life for Men, 1960" U. S. Department of Labor, Bureau of Labor Statistics, Monthly Labor Review, July 1963. On this basis,

using a 6% simple rate of interest, as required in Pennsylvania, the present value of future expected earnings in the absence of the accident would be 15.7480 x $3,000.00 or $47,244.00.

60. Plaintiff's lack of education and training foreclose the opportunity of holding a job other than one utilizing the abilities of an unskilled laborer.

61. Plaintiff now works part time for his brother-in-law driving a truck. He drives once or twice a week in general, sometimes three times and sometimes not at all. He earns between $15.00 and $40.00 a week depending on how much he works. Plaintiff also remains capable of doing some other light, sedentary type of work.

62. Plaintiff presented no evidence at trial of permanent, total disability. On the basis of the above evidence of present employment and employment capacity and of earnings subsequent to the accident, together with the nature of the injury itself, the Court believes that a fair evaluation of plaintiff's injury indicates a loss of 70% of future earning capacity. On this basis plaintiff's future wage loss is 70% of $47,244.00 or $33,070.80.

63. Plaintiff has suffered long and intense physical pain from his injuries and from the series of treatments and surgery he has been required to undergo. A reasonable amount of compensation for pain and suffering is $50,000.00.

64. Total damages of plaintiff attributable to the accident are in the amount of $110,280.36.

## DISCUSSION

### A. BACKGROUND

This is a civil action brought by plaintiff Robert A. Fisher against defendant United States of America under the Federal Tort Claims Act to recover for injuries he sustained while working on the construction of the Alvin D. Bush Dam at Kettle Creek, near Renovo, Pennsylvania. The defendant United States was the owner of property upon which the Dam was being constructed. In June,

1960, it engaged George M. Brewster & Son, Inc. (hereinafter referred to as "Brewster") as general contractor to oversee the construction of the Dam. Brewster then subcontracted the performance of the bulk of the concrete work necessary under its contract with the Government to the H. I. Lewis Construction Co., Inc. (hereinafter referred to as "Lewis"). Lewis in turn subcontracted the supporting structural steel work required in the concrete work to Berks Steel Service, Inc. (hereinafter referred to as "Berks"). Plaintiff, at the time he sustained the injury out of which this action arose, was employed by Berks and was in the performance of work in Berks' subcontract with Lewis.

On June 22, 1960, the third day of his employment by Berks, and the third day of his work on construction of the Dam, plaintiff descended into a wooden form, one of several structures used to make concrete structures at the Dam site. These forms were composed of two flat, wooden walls ten feet high and four feet apart. On the day referred to, the water intake portion of the flood control dam was in the early stages of construction. It was intended that this area would later be under water and would have the function of allowing water to enter into a large tunnel and escape down river in times of heavy rainfall. To regulate the flow of water into the tunnel, three tunnel-like inlets, controlled by separate gates, were to be constructed. Prior to the date of the accident, a huge concrete slab had been completed at the base of the Dam. Upon this slab, wall-like structures were to be constructed in concrete so that the three inlets described above would have sides. Wooden forms like the one into which plaintiff descended were used to provide a shape into which the concrete was to be poured to create the walls described above. The forms were pulled together by tie rods and held apart by other boards called "spreaders", in order to maintain their shape. These spreaders were to be removed when concrete was poured into the forms.

After descending into the form, plaintiff did some tying and untying of reinforcement steel within the walls of the form, part of the work assigned to him by Berks. When he had completed this process, plaintiff decided to move further back in the form to assist another employee of Berks doing similar work. To get from one side of the form to the other, plaintiff began to cross the form by using the spreaders as a plank walkway, as he had seen other employees of Berks do previously. The second spreader on which plaintiff stepped broke loose from the form and the plaintiff fell to the concrete slab some ten feet below, striking his left ankle on some of the reinforcement steel at the concrete slab level. As a result of this fall, plaintiff has undergone five operations with intense and constant pain throughout the first four years after the accident, and intermittent severe pain ever since. He has sustained permanently incapacitating injuries.

Plaintiff instituted this suit against the Government alleging that it designed the dam project, retained at least some of the direction, supervision and control of its construction, and caused the plaintiff's injuries by its negligence in failing to warn the plaintiff of an unsafe condition, failure to properly supervise the construction, and failure to require that adequate safety precautions be taken to provide plaintiff with a safe place in which to work. The Government denied any negligence on its part and alleged that the accident was due solely to the negligence of plaintiff. The Government joined Berks, the steel erector, and Brewster, the general contractor, alleging that if the Government were held liable, those parties would be liable to the Government for full indemnity of, or at least for contribution to, any verdict the Government might become obligated to pay. As against Berks, the Government alleged breach of warranty of workmanlike performance and alternatively, that negligence on the part of the Government, if any, would be only secondary or passive, while Berks' negligence, if any, would be primary or active negligence. On these

grounds the Government claimed the right to full indemnity against Berks. As against Brewster, the Government asserted that if it (i. e. the Government) were held liable, then (1) an indemnity provision of the contract between the Government and Brewster rendered the latter liable over to the Government for the full amount of any judgment obtained against the Government; (2) Brewster was liable to the Government for full indemnity on the basis of unworkmanlike performance of its general contract; (3) Brewster was liable for full indemnity or contribution to the Government as a result of Brewster's negligence. Brewster then joined Lewis based upon the contract between Brewster and Lewis and upon negligence of Lewis, and sought indemnity or contribution from Lewis. Lewis then filed a cross-claim against Berks, asserting that if Lewis were held liable such liability would be due to the primary negligence of Berks, or, at least, that Berks' actions or failure to act constituted a breach of an express or implied contract with Lewis. Lewis therefore alleged that it was entitled to indemnity or contribution from Berks. Brewster also filed a similar cross-claim against Berks.

## B. PLAINTIFF v. THE GOVERNMENT

Plaintiff in this action contends that the Government, as possessor of the land on which the Kettle Creek Dam was being constructed and on which plaintiff was a business invitee, had a duty to protect plaintiff against unreasonable risks of harm resulting from dangerous conditions on its land of which it knew or by the exercise of reasonable care should have discovered. Plaintiff further contends that the Government as possessor of the land on which the Dam was constructed had an additional duty to protect its business invitees from physical harm caused by the accidental, negligent or intentional harmful acts of third persons on its land, and by its failure to discover the existence or likelihood of such acts and to warn or otherwise protect its invitees from such harm. Plaintiff claims that the Government

breached these duties in the instant case by failing to warn the plaintiff of the danger of stepping on spreaders or to see that Berks, as plaintiff's employer, warn him of that danger. Plaintiff points out that he was an inexperienced employee unaware of spreaders or their use and only in his third day in the employ of Berks and his third day on the construction of the Dam. In support of his position plaintiff relies in part on Restatement of Torts (Second) §§ 318 and 343 which provide as follows:

§ 318. Duty of Possessor of Land or Chattels to Control Conduct of Licensee

If the actor permits a third person to use land or chattels in his possession otherwise than as a servant, he is, if present, under a duty to exercise reasonable care so to control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the actor

(a) knows or has reason to know that he has the ability to control the third person, and

(b) knows or should know of the necessity and opportunity for exercising such control.

§ 343. Dangerous Conditions Known to or Discoverable by Possessor

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

Plaintiff also brings to the attention of the Court Restatement 344 which provides as follows:

> § 344. Business Premises Open to Public: Acts of Third Persons or Animals
>
> A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to
>
> (a) discover that such acts are being done or are likely to be done, or
>
> (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.

The Court considers that the evidence in this case places the Government squarely within the class of persons subject to the obligations of § 318, and that §§ 343 and 344, while perhaps not directly controlling in the instant case, shed considerable light on the duty imposed on a possessor of land under Pennsylvania law to protect or warn its invitees of unreasonable risks of harm as hereinafter set forth.

Defendant United States contends, on the other hand, that it was neither in possession nor to any degree in control of the land on which the Dam was being constructed or of the methods of operation of the independent contractor upon it, but rather was an owner out of possession which had turned over possession to another, and therefore was under no duty to warn or otherwise protect plaintiff. Further, it contends that any danger which may have created a risk of harm to plaintiff was in full view and obvious to plaintiff and, therefore, that plaintiff was guilty of contributory negligence. In addition, it contends that even if the Government had a duty to warn plaintiff or see that he was warned, that duty was fulfilled because Berks' foreman did warn plaintiff of the danger.

■ The Court cannot accept the Government's contention that it was not in possession of the land and did not exercise any element of control over the operations or safety procedures undertaken. The evidence from the testimony of the Government's own employees established that the Government had a resident engineer on the premises, Mr. Weaver, who was in general charge of the construction and whose duties involved generally checking the work to see that it was done according to the specifications and supervising the safety inspection work of the Government inspection force. The evidence further established that Mr. Weaver required the contractor to furnish him with a safety plan and it was within his authority to require the contractor to include safety regulations within that plan. In this connection it is also important to note that the contract between the Government and Brewster provided in GC-16 (e) that:

> The Contracting Officer will notify the Contractor of any noncompliance with the foregoing provisions and the action to be taken. The Contractor shall, after receipt of such notice, immediately take corrective action. Such notice, when delivered to the Contractor or his representative at the site of the work, shall be deemed sufficient for the purpose. If the Contractor fails or refuses to comply promptly, the Contracting Officer may issue an order stopping all or part of the work until satisfactory corrective action has been taken. No part of the time lost due to any such stop order shall be made the subject of claim for extension of time or for excess costs or damages by the Contractor.

In addition, the evidence establishes that the Government had inspectors whose duty it was to see that the work was done in accordance with the specifications and also that there were no violations of safety precautions. These men

had frequently issued safety directions to those working at the site on previous occasions. In light of these facts and other evidence brought out at trial, the Court is of the opinion that the Government was in possession of the Dam site and exercised a substantial amount of control over safety practices there. The Court therefore believes that, *assuming it were necessary* for the plaintiff in this case to establish the Government's control over safety practices at the Dam site in order to hold the Government *liable for the contractor's failure* to take the proper safety precautions (i. e. for the application of Restatement (Second) Torts §§ 413–416), there is ample evidence in the Record to establish such control. In Spinozzi and Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co. v. E. J. Lavino and Company, 243 F. 2d 80 (3rd Cir. 1957), the court considered the rationale and application of the control doctrine with respect to the *liability of employers of independent contractors* in general, saying (at page 82):

> "It is the general rule that the employer of an independent contractor is not responsible *for the misconduct of the contractor* while the latter is performing under the terms of the contract. The rule is justified on the ground that since the employer does not control the work being performed, he should not be liable for the harm resulting from the substandard performance of the independent contractor. *Following this line of reasoning, it is apparent that where the employer has retained some element of control of the job, he should be responsible for the harmful consequences of its performance as a concomitant of the control retained.*" (Citations omitted and emphasis added).

See also Hennigan v. Atlantic Refining Co., 282 F.Supp. 667 (E.D.Pa.1967) treating *Spinozzi,* as an application of Restatement (Second) Torts §§ 413–416. In applying this doctrine from the *Spinozzi* case, the Third Circuit in Quinones v. Township of Upper Moreland, 293 F.2d 237 (3rd Cir. 1961), considered the lia-

bility of the Township in its employment of an independent contractor. There the only evidence of control was the fact that Township's Engineer was authorized to obtain compliance with the specifications of the contract and that the Engineer's inspector visited the job two or three times a week for this purpose. The court concluded that there was ample evidence to support the jury's fact-finding that Township had retained control in the performance of the independent contractor's contract. *Quinones, supra* at 241. In that case the contract specifications required shoring in accordance with Pennsylvania law, and the failure to provide shoring was the proximate cause of the death of the plaintiff employee of the independent contractor. Similarly, in the instant case, the prime contractor Brewster was required, and the Government's resident engineer and inspection force were authorized, to insure compliance with the specifications of the prime contract by subcontractors. Those specifications incorporated by reference the provisions of the United States Army Corps of Engineers Manual which provides in part that "each employee should be provided initial indoctrination and such continuing instruction as will enable him to conduct his work in a safe manner" (Exhibit G–8, Section 1, Provision 1–1), and it was failure to comply with this provision which was the proximate cause of the plaintiff's injury. But unlike the situation in *Quinones*, where the Engineer was on the scene only two or three times a week, in the instant case the Government had a resident engineer constantly at the site and an inspection force at the scene of construction daily.

■ But the Court believes there is a more fundamental weakness in the Government's position in the case at bar. Here the plaintiff does not rest his case on a theory of vicarious liability of the Government by virtue of which the latter would be held liable for the negligent acts of its independent contractor or subcontractors. Nor does plaintiff rest his case on any duty of employers of independent contractors in general. In-

stead, he relies on the obligation of *possessors of land* who permit third persons to conduct activities on that land to protect their invitees from unreasonable risks of harm.[1] It would appear to be evident from a comparison of the relevant Restatement provisions and the Pennsylvania cases interpreting and applying them that the significance of the inquiry into the actual exercise of control is considerably different when the issue is the landowner's liability for its own negligence in failing to protect its invitees from unreasonable risks of harm than its significance where the issue is the liability of employers of independent contractors in general, and in particular where it is the vicarious liability of those employers. *Compare* Restatement (Second) Torts § 318 (1965) with Restatement (Second) Torts §§ 413–416 (1965). Compare also, for example, Glass v. Freeman, 430 Pa. 21, 240 A.2d 825 (1968) and Styer v. City of Reading, 360 Pa. 212, 61 A.2d 382 (1948) with Mazer v. Lipschutz, 327 F.2d 42 (3rd Cir. 1964) and Brown v. Moore, 247 F.2d 711, 69 A.L.R.2d 288 (3rd Cir. 1957) (the latter cases cited by the Government) ; see also Restatement (Second) Torts §§ 343 and 344 (1965) and Smith v. Lit Brothers, 174 Pa.Super. 102, 100 A.2d 390 (1953). It is further evident from Comment a. to Section 318 which reads in relevant part:

"a. *Possessor's peculiar ability to control third person using his property.* The mere fact that the possessor of a chattel or of land permits a third person to use the chattel or conduct an activity upon the land *is not regarded as sufficient* to make the possessor liable *for the manner in which the third person* uses the chattel or *carries on the activity.* [i. e. *vicarious* liability of employer of independent contractor]. *It is, however, enough* to require the possessor *to exercise with reasonable care the ability which the possession gives to him* to control the third person's use or activity when he

knows or should know that its exercise is necessary to prevent harm to others." (Emphasis and bracketed material added).

For the importance of the actual exercise of control in the case of those in possession of land is not so much in its own right but rather primarily in its bearing on the issues of whether the possessor knows or has reason to know that he has the *ability to control* the third person and whether he knows or should know of the *necessity and opportunity* for exercising control. Restatement (Second) Torts § 318 (1965). The Court believes that plaintiff has clearly met the burden of proof on these issues from the evidence described above and set forth in the Findings.

 The application of the above principles of law in favor of an employee of an independent contractor doing work on land in the possession of another is well illustrated in the recent case of Glass v. Freeman, 430 Pa. 21, 240 A.2d 825 (1968), decided just a few months ago by the Supreme Court of Pennsylvania. In that case plaintiff was injured while doing work for defendant landowners, when a tractor operated by another independent contractor and left unattended with the motor running, was set in motion by the tractor operator's seven year old son. The landowners contended that they had breached no duty to plaintiff. In affirming judgment against the defendant landowners (as well as against the defendant contractor), the court stated at 430 Pa. 28, at 240 A.2d 829:

"It is established in Pennsylvania that a possessor of land who permits a third person to conduct an activity on the land has a duty to exercise reasonable care to prevent that third person from creating an unreasonable risk of bodily harm to others, if the possessor knows or has reason to know that he has the ability to control the third person and that there is a need and opportunity to exercise control.

1. See footnote 2, *infra*, p. 29.

With respect to business invitees, a possessor of land has an additional duty to exercise reasonable care to discover the negligent acts or the likelihood of negligent acts by third persons and to warn or otherwise protect his business invitees. One aspect of this duty is that the possessor of land must exercise a reasonably careful supervision of the appliances and methods of an independent contractor whom he has employed or permitted to carry on upon the land an activity directly or indirectly connected with the business use thereof." (citations omitted).

In that case, the court held defendant landowners liable not because they actually exercise control in a negligent fashtion, but because they failed to exercise supervision in circumstances indicating their ability to exercise control and the opportunity and necessity for such control. In the instant case, the evidence of ability and opportunity for exercising is much stronger. For in this case Mr. Weaver and the Government inspectors had actually provided supervision of safety matters in the past both through the safety plan Mr. Weaver required of the contractors and the warnings issued to workmen and their foremen by the inspectors. Further there was testimony that Mr. Weaver was aware that subcontractors sometimes hired inexperienced personnel and that the Government inspectors knew that the spreader boards, natural stepping places for inexperienced workmen were unsafe to stand upon. In light of these facts, and particularly in light of the fact that workmen had previously stepped on spreaders, the Government should have known of the necessity for protecting plaintiff from an unreasonable risk of harm. It should be noted that in evaluating the reasonableness of a defendant's conduct, it is a fundamental principle of tort law that an actor is held not only to the standard of reasonable men in general, but also to such superior attention, perception, memory, knowledge, intelligence, and judgment as the actor himself has. Restatement (Second) Torts § 289(b). In Gowdy v. United States, 271 F.Supp. 733 (W.D.Mich. 1967), the court, in applying the law of Michigan, which like Pennsylvania, follows closely the Restatement of Torts in this area, pointed out that the Government is among the most knowledgeable in the field of safety engineering and the hazards of construction work. In holding the Government liable for failing to protect a workman invitee from unreasonable risks of harm, the court pointed out that the above factors distinguish the Government from the average small landowner, and mentioned as evidence of the above factors the identical Corps of Engineers Manual involved in this case. In light of all these considerations, we believe the Government was negligent in failing to warn or otherwise protect plaintiff in the case at bar.

The Government relies in support of its position on cases so numerous that it is entirely impracticable to discuss them all at length here. We do discuss a few of those of the Government's cases which are more nearly related to, though clearly distinguishable from, the case at bar.

The Government relies first on Kirk v. United States, 9 Cir., 270 F.2d 110 (1959), which is indeed similar in certain factual respects to the instant case. That case did involve the fall of a workman during the construction of a dam being built by an independent contractor under the same basic contract involved here. But in other significant factual respects, and in important legal respects, the cases differ substantially.

In the first place, the Kirk case dealt not with the law of Pennsylvania, which is undoubtedly the applicable law here under the Federal Tort Claims Act since it is the place where the acts or omissions complained of occurred (28 U.S.C.A. § 1346(b)), but with the law of Idaho. It is significant in this connection to note that in the later case of Hamman v. United States, 267 F.Supp. 411 (D.Mont.1967), reviewing *Kirk*, the court indicated that there may well be substantial conflict between the law expressed in *Kirk* and that expressed in

Quinones v. Township of Upper Moreland, *supra* (applying the law of Pennsylvania). The court in *Hamman* concluded that to the extent of any conflict it was bound by *Kirk* (267 F.Supp. at 418, n. 13). To the extent of conflict, we, of course, are bound on the other hand by *Quinones*.

In the second place, unlike the situation in this case, the District Court in *Kirk* had found that the United States was not negligent in any way, either in connection with requiring enforcement of its safety regulations or otherwise. Consequently, on appeal plaintiff sought to predicate recovery on the theory that the Government could be held responsible vicariously for the contractor's negligence, and it was only that theory which the court rejected. In this connection, it is worth noting that the case of Gowdy v. United States, 271 F.Supp. 733 (W.D. Mich.1967), pointed out that *Kirk* stood solely on that basis, and distinguished the obligation of the possessor of land in his own right to protect its invitees from unreasonable risks of harm, permitting recovery on the latter basis. The court in *Gowdy* regarded the Restatement of Torts as expressing the applicable law in Michigan with regard to the duties of a possessor of land, just as it does in Pennsylvania. Glass v. Freeman, *supra*, 430 Pa. pp. 28, 29, 240 A.2d p. 829.

Finally, it is important to note that the District Court in *Kirk* found that the plaintiff was negligent in failing to use a safety belt provided for him, and that such negligence proximately contributed to the accident. No similar circumstance exists in this case.

The cases of Grogan v. United States, 341 F.2d 39 (6th Cir. 1965); and United States v. Page, 350 F.2d 28 (10th Cir. 1965), *cert. den.* 382 U.S. 979, 86 S.Ct. 552, 15 L.Ed.2d 470 (1966), cited by the Government, are inapplicable for basically the same reasons as those making the *Kirk* case inapplicable. It is noteworthy that the accident in the *Page* case did not take place on the Government's property at all, but rather at the contractor's own plant.

The Government also relies on Hader v. Coplay Cement Manufacturing Company, 410 Pa. 139, 189 A.2d 271 (1963), which does deal with Pennsylvania law. Whether that case remains in every respect the law of Pennsylvania in light of the more recent decisions of Hennigan v. Atlantic Refining Co., 282 F.Supp. 667 (E.D.Pa.1967) and Glass v. Freeman, 430 Pa. 21, 240 A.2d 825 (1968) is open to some question. But in any event, insofar as that case dealt not with the liability of the employer of an independent contractor in general for the contractor's negligence, but with the obligations of a possessor of land to his invitees,[2] it dealt only with his obligation with respect to dangers *known or obvious to such invitees*. The conclusion that a possessor of land is not in general liable to his invitees for harm caused by any activity or condition on the land where a dangerous condition is known or obvious to the plaintiff, is in no way in conflict with the conclusion we have reached in this case or the framework set out in Restatement (Second) Torts §§ 318, 343 and 344 to which we have referred. In fact the very same principle is set forth in another Restatement section within that framework. Restatement (Second) Torts § 343A (1965). And we do not believe that the danger of stepping on spreaders was by any means obvious to the plaintiff in this case, a man only in his third

---

2. The Court in *Hader* did not regard principles of law dealing with possessors of land as controlling, because it concluded as a factual matter that the landowner was out of possession, having temporarily given up possession to the contractor. Unlike the present case, there was no resident engineer of the landowner nor a permanent inspection force of the landowner on the premises in *Hader*. In the *Spinozzi* and *Quinones* cases, discussed *supra*, the plaintiffs did not rely on the obligations of a possessor of land. The courts found sufficient control to impose liability on the landowners as an employer of an independent contractor in general, and did not have to determine whether those obligations were applicable. Consequently they did not deal with or discuss those obligations.

day on the job, only in his third day of work for the company doing this type of work, and unfamiliar with the forms here involved and the spreader boards holding them apart. We therefore do not regard *Hader* as applicable here.

■ The above discussion disposes also of the Government's second contention, that plaintiff was contributorily negligent because any danger which existed was obvious to him.

■ There remains the Government's contention that plaintiff was in fact warned of the danger by Berks' foreman Varner. It is true that Mr. Varner did testify on cross-examination that he warned plaintiff of this hazard when they met prior to the beginning of the work at the home of plaintiff. But it is also true that in a prior deposition and on direct examination, when Mr. Varner was asked whether anyone had told plaintiff not to stand upon the spreaders, he answered "no". Under these circumstances, we find the testimony of plaintiff that he was never warned more credible than that of Mr. Varner.

One further point requires discussion with respect to the determination of the basic issue of liability of the Government to plaintiff in this case. The Government in its third party complaint presented, in addition to many hypothetical averments against the third party defendants Brewster and Berks, a number of unqualified factual averments, dealing with the conduct of those defendants. During the course of trial, plaintiff attempted to introduce these statements into evidence as admissions against the Government. Taking into consideration the fact that this was a non-jury case, the Court permitted this evidence to be admitted. Later in the case, the parties submitted briefs on the admissibility of this evidence. Plaintiff contended that when the statements offered are factual averments pleaded unequivocally in a carefully prepared complaint which plainly distinguishes between such averments and other hypothetical averments, they are admissible. The Government contended that under

the Federal Rules of Civil Procedure which permit liberal use of inconsistent pleadings, allegations of a third party complaint never constitute admissions of the third party plaintiff. After considering the relevant authorities, the Court has concluded that the resolution of this issue is by no means clear. However, since there was more than ample other evidence in the record to substantiate plaintiff's position as against the Government, the Court has decided to disregard this evidence entirely and has not relied on it in any way in reaching its conclusions in this case.

## C. GOVERNMENT v. BERKS

■ The Government contends, among other claims in this case, that if it is held liable to plaintiff in damages for the injuries plaintiff has sustained, then it is entitled to be indemnified by Berks in the full amount it is obligated to pay plaintiff. The Government grounds this claim on the "active-passive primary-secondary" theory of indemnity which is recognized in the law of Pennsylvania. It is the Government's position that if it is held liable, then such liability is a product of the primary negligence of Berks, which brought plaintiff, a workman inexperienced in dam construction to the scene of the accident, failed to instruct him properly in the safe manner of performing his work, and by allowing other of its employees to walk on spreaders, negligently created for plaintiff the impression that to do so was a safe and proper method of operation.

Berks concedes that it had a duty to warn plaintiff of the hazard of stepping on spreaders and that the right of the passive wrongdoer to recover indemnity from the active wrongdoer, except where the latter is protected by a Workmen's Compensation Act, is a well-established part of the law of Pennsylvania. Berks contends in the first place, however, that its foreman, Varner did warn plaintiff. The Court's reasons for rejecting this contention have been set forth in a

prior part of this discussion. But Berks further contends that a finding of liability in this case must rest on a finding that the Government had a duty to warn plaintiff, and that such a duty was at least as great as the duty owed plaintiff by Berks. On this basis, Berks contends that the Government would be entitled to recover only contribution and not indemnity from Berks. Finally, Berks contends that a recovery of indemnity under the theory here involved has never been allowed in Pennsylvania against an employer protected by a Workmen's Compensation Act.

The established principles in Pennsylvania with regard to the theory of recovery of indemnity on which the Government relies are set forth in the leading case of Builders Supply Co. v. McCabe, 366 Pa. 322, 77 A.2d 368, 24 A.L.R.2d 319 (1951). It is evident from the following passages from that case, setting forth the basic law and quoted in numerous subsequent cases, that recovery of indemnity is not limited to situations involving a legal relationship between indemnitee and indemnitor, such as master-servant:

" * * * The right of indemnity rests upon a difference between the primary and the secondary liability of two persons each of whom is made responsible by the law to an injured party. It is a right which enures to a person who, without active fault on his own part, has been compelled, by reason of some legal obligation, to pay damages occasioned by the initial negligence of another, and for which he himself is only secondarily liable. * * *

"Without multiplying instances, it is clear that the right of a person vicariously or secondarily liable for a tort to recover from one primarily liable has been universally recognized. But the important point to be noted in all the cases is that secondary as distinguished from primary liability rests upon a fault that is imputed or constructive only, being based on some legal relation between the parties, *or*

arising from some positive rule of common or statutory law *or because of a failure to discover or correct a defect or remedy a dangerous condition caused by the act of the one primarily responsible.*" 366 Pa. at 325 and 327–328, 77 A.2d at 370 and 371 (emphasis in last sentence added).

See, for example, Tromza v. Tecumseh Products Co., 378 F.2d 601 (3rd Cir. 1967); Quinones v. Township of Upper Moreland, 293 F.2d 237 (3rd Cir. 1961); Pittsburgh Steel Co. v. Patterson-Emerson-Comstock, Inc., 404 Pa. 53, 171 A.2d 185 (1961), for cases quoting the above excerpt and applying this principle both in decisions allowing recovery in indemnity and in ones denying such recovery.

Furthermore, the argument that recovery of indemnity is limited to situations involving such legal relations, has been raised and specifically rejected. In Tromza v. Tecumseh Products Co., *supra,* plaintiff, a repair man, was injured when he submitted a refrigerator to a pressure of 170 pounds and a compressor unit in it exploded. The refrigerator carried a plate with notice that the factory test pressure was 195 pounds. The compressor unit and its steel casing or shell had been manufactured by Tecumseh and sold to Marquette, which incorporated it in the refrigerator which it manufactured and from which plaintiff's injuries arose. The jury found Tecumseh negligent in manufacturing a defective compressor unit and failing to discover the defect, and found Marquette negligent in failing to make a proper test or inspection of the unit. The District Court entered judgment against both defendants pursuant to the jury's verdict and found against Marquette in the latter's cross-claim for indemnity based on the "active-passive, primary-secondary" theory of indemnity recognized in Pennsylvania. The District Court's determination on the cross-claim was based on the theory that the two defendants were charged with essentially identical negligence, since in both cases the negligence could be described as "failure to make a proper

inspection". Further, the court found that a legal relationship, such as master-servant, between the defendants is ordinarily the basis for the primary-secondary distinction in Pennsylvania. The Third Circuit, in vacating that part of the District Court's decision dealing with the cross-claim, stated with regard to the above view:

" * * * *Pittsburgh Steel Company* and *Builders Supply Co.* which it [the District Court] cites, afford no nourishment to its view, since they specifically do not limit application of the primary-secondary liability doctrine to cases where a legal relationship exists between the party primarily liable and the party secondarily liable.

"That that is so is clearly evident from the following quotation from the Pennsylvania Supreme Court's opinion in Builders Supply Co. at 366 Pa. 327–328, 77 A.2d 371:" [the Court then quoted the two passages from the *Builders Supply* case quoted above] 378 F.2d at 605.

In characterizing the nature of primary and secondary negligence, the court quoted further from the *Builders Supply* case at 366 Pa. 325–326, 77 A.2d 370 as follows:

" * * * The difference between primary and secondary liability is not based on a difference in *degrees* of negligence or on any doctrine of *comparative* negligence,—a doctrine which, indeed, is not recognized by the common law. See Fidelity & Casualty Co. of New York v. Federal Express, Inc., 6 Cir., 136 F.2d 35, 40. It depends on a difference in the *character* or *kind* of the wrongs which cause the injury and in the nature of the legal obligation owed by each of the wrongdoers to the injured person." Quoted at 378 F.2d 605.

Applying these principles to the facts of the *Tromza* case, the court concluded that Tecumseh, as the manufacturer of the compressor unit, was responsible in the first instance for the defective condition which resulted in the injury to the plaintiff. The court rejected the argument of Tecumseh that, since the negligence of each could be described as failure to make a proper inspection, both parties were guilty of identical negligence. The court considered the negligence of Tecumseh as a two-pronged negligence in manufacturing a defective component and failing to discover the defect and that of Marquette as only the latter. The court therefore ruled that Marquette's negligence was only secondary, whereas Tecumseh's negligence was primary, and permitted recovery of indemnity by Marquette against Tecumseh.

█ As much or more can be said of Berks' negligence in the instant case. Berks hired plaintiff, whom it knew to be inexperienced in the type of construction work here involved, and assigned him to this type of construction. Berks failed to instruct the plaintiff in the safe manner of moving about in the forms, when it knew that such movement would be a natural and necessary part of the particular operation it had been assigned to perform; in particular, Berks failed to warn plaintiff of the danger of walking on spreaders. Furthermore, by allowing its other employees to stand on spreaders, Berks created for plaintiff the impression that this was the safe and normal manner of carrying on his work. That the Government as possessor of the land failed to warn plaintiff of the hazard thereby created does not relieve Berks of its primary responsibility in the matter.

But Berks contends that a finding that the Government retained some element of control and was negligent in the exercise thereof precludes a finding that Berks was the primarily negligent party and the Government only secondarily negligent. In addition, Berks contends that the primary-secondary distinction has never been applied in Pennsylvania to permit recovery of indemnity, as opposed to contribution, against an employer. The Court believes that both of these contentions are fully answered by the im-

portant case of Quinones v. Township of Upper Moreland, 293 F.2d 237 (3rd Cir. 1961), discussed briefly in an earlier part of this discussion. In that case, Sixto Quinones, a laborer, employed by McCabe Brothers (hereinafter referred to as "McCabe"), a contractor performing a sewer construction project for the Township of Upper Moreland, was killed when an unshored trench in which he was working caved in. The sewer was being constructed pursuant to a contract which entrusted the entire sewage construction project to McCabe and provided that shoring of trenches was to be in accordance with Pennsylvania laws and regulations. The work was to be performed in accordance with the specifications set forth and an engineering firm hired by the Township was authorized to insure compliance by McCabe with the specifications.

Plaintiff's administratrix brought suit against the Township and against the Township's Engineer, and the Township impleaded McCabe on the theory that if it (Township) were liable to plaintiff, then it would be entitled to recover indemnity from plaintiff's employer, whom it alleged to be the primarily negligent party. The jury returned a verdict against the Township and its Engineer, but found in favor of McCabe and against the above defendants in their third party claim. The District Court denied the Township's motion for a new trial with respect to its claim for indemnity against McCabe but did grant judgment n.o.v. to Township in the latter's motion for *contribution* from McCabe, limiting recovery thereunder to the amount of McCabe's Pennsylvania Workmen's Compensation liability. The Court based its ruling permitting only contribution and not indemnity on the ground that the defendant Township and the defendant McCabe were guilty of essentially identical negligence, the negligence in each case being described as "failure to construct shoring in the trench in accordance with Pennsylvania law," and, therefore, that these defendants were concurrently negligent.

On appeal, the Township claimed that there was insufficient evidence from which the jury could conclude that it had retained sufficient control to make it liable to plaintiff, or alternatively, that it was entitled to indemnity rather than contribution from McCabe. The Third Circuit, noting among other things that the inspector for the Engineer hired by the Township visited the construction site two or three times a week, ruled that Township had retained sufficient control to make it liable to plaintiff, and that its failure to take adequate steps to have the trench shored in accordance with Pennsylvania law plainly constituted negligence on the part of the Township. *Nevertheless,* the court, after discussing the basis for recovery of indemnity based on the distinction between primary and secondary negligence, ruled that McCabe's liability for failure to shore the trench was primary and that of the Township only secondary, and permitted a recovery of indemnity by the Township against McCabe for the full amount of plaintiff's verdict against the Township.

This Court believes that the principles set forth in the *Quinones* case are controlling in the instant case with respect to the Government's contention that it is entitled to indemnity as opposed to contribution from Berks, and that those principles squarely support the Court's conclusion that this contention of the Government is correct.

There is however one further contention of Berks with respect to the applicability of the *Quinones* decision on this point which it is quite important to consider. Berks admits that "at first blush" the *Quinones* case appears to be controlling as against its position in the instant case, but argues that there is a fundamental difference between the *Quinones* case and the case at bar and that the court in *Quinones* relied on this difference in reaching its decision that the Township was entitled to indemnity rather than contribution from McCabe. Berks points out that in *Quinones* there was a contract between

the Township and McCabe which provided in part that the contractor would "indemnify and save harmless the * * Township * * * from all suits or actions at law of any kind in connection with this work." 293 F.2d 240 n. 2. Berks contends that because of the existence of the contract, the finding of primary negligence on the part of McCabe and secondary negligence on the part of the Township was unnecessary to the decision in *Quinones*. Berks therefore contends that the Third Circuit's characterization of primary and secondary negligence and its decision that the Township was entitled to indemnity rather than contribution are not controlling in the instant case, where there is no similar contractual provision.

The Government, and elsewhere in this case, Lewis (see Part E of this discussion), contend on the other hand, that a careful reading of *Quinones* reveals that the court would have reached the same result on the basis of the discussion therein whether indemnity was granted pursuant to the terms of the contract or pursuant to the common law.

This Court does not agree with either of these positions in its entirety. For behind the broad gloss on the one side that the finding of primary and secondary negligence was unnecessary to the decision and the broad position on the other side that the contractual provision was unnecessary to the decision lurk two separate and distinct questions:

1. Was the court's conclusion that the Township was entitled to recover indemnity rather than contribution based on the contractual indemnity provision alone and not on a finding of primary and secondary negligence (and therefore not applicable in the present case)?

2. Was the court's conclusion that the Township's recovery of indemnity was not limited to the amount of the Workmen's Compensation liability based on the contractual indemnity provision and therefore not determinative in the present case?

This Court agrees with the Government and Lewis with respect to the first of these questions. That is, this Court believes that a finding of primary and secondary negligence *was essential* to the court's determination that Township was entitled to indemnity rather than contribution even under the contractual indemnity provision. This point is discussed and explained below in the present section. But this Court agrees with Berks with respect to the second of these questions. That is, this Court believes that the Third Circuit in *Quinones, once having determined that McCabe was primarily negligent and the Township secondarily negligent,* awarded indemnity *pursuant to the contract but nevertheless on the basis of the determination of the primary negligence of McCabe and the secondary negligence of the Township.* Because the court awarded indemnity *pursuant to the contract,* it held without further discussion that recovery was not limited in amount to McCabe's Workmen's Compensation liability. This point is considered and explained in Part G of this discussion, *infra.*

 In support of its argument that the finding of primary and secondary negligence was not essential to the court's determination that the Township was entitled to indemnity rather than contribution, Berks relies on the following passage:

"Applying the principles stated to the instant case we are of the opinion that the testimony establishes that McCabe's liability for failure to shore the trench was *primary* and that of Township *secondary* and accordingly, under the indemnity provisions of the contract between the parties, Township is entitled to a judgment of indemnity against McCabe in its third-party action to the full extent of plaintiff's verdict against Township." 293 F.2d at 242–243.

Berks of course stresses the language "under the indemnity provisions of the contract" and dismisses the reference to primary and secondary liability. But

in making this argument Berks ignores the very body of law and cases which it calls to the attention of the Court in connection with another issue in this case (see Part E of this discussion). For it is the law of Pennsylvania that although a contract indemnifying a party against its own negligence is valid, indemnity provisions are strictly construed, and the intention to include within the scope of such a provision protection against a loss due to the indemnitee's own negligence must be clear and unequivocal. Pittsburgh Steel Co. v. Patterson-Emerson-Comstock, Inc., 404 Pa. 53, 171 A.2d 185 (1961); Brotherton Construction Co. v. Patterson-Emerson-Comstock, Inc., 406 Pa. 400, 178 A.2d 696 (1962); Brown v. Moore, 247 F.2d 711 (3rd Cir. 1957); Perry v. Payne, 217 Pa. 252, 66 A. 553 (1907). In particular, where indemnitor and indemnitee are guilty of concurrent, primary, active negligence, or the indemnitee is guilty of primary negligence and the indemnitor of secondary negligence, indemnity is not allowed under such a provision in the absence of clear and unequivocal intent. Morton v. Union Traction Co., 20 Pa.Super. 325 (1902). But where the loss results from the primary negligence of the indemnitor and the secondary negligence of the indemnitee, indemnity is permitted. Baltimore & Ohio R. Co. v. Alpha Portland Cement Co., 218 F.2d 207 (3rd Cir. 1955). And it is quite clear from a careful reading of the lower court's opinion and the briefs in *Quinones* that the issues revolved around these principles. In this regard the following passage from the District Court's opinion is particularly significant:

"In Pennsylvania the general rule is that a contract of indemnity will not be held to protect the indemnitee against the consequences of his own negligence unless such intent is clearly shown in the contract. The reasoning most frequently offered to support this rule is that to hold otherwise would be to put the indemnitor at the mercy of the indemnitee's negligent conduct, a result which the court would not permit absent a clear showing that the parties so intended. *The contractual language in this case is of the type usually held not clearly to show such intent.* Given the general rule and this language, the law is clear as to the result under various circumstances. Where the loss is caused by the sole negligence of the indemnitor, indemnity is allowed. Where the loss results from the sole negligence of the indemnitee, indemnity is not allowed. *Where the loss results from active, or primary, negligence by the indemnitor and passive, or secondary, negligence by the indemnitee, indemnity is allowed.* Where the loss arises from active negligence by the indemnitee and passive negligence by the indemnitor, indemnity is not allowed." (187 F. Supp. at 266–267; emphasis added and citations omitted).

That is to say, the District Court treated the contract just as if it explicitly stated that McCabe would indemnify the Township, *provided* McCabe was the sole or primarily negligent party and the Township not negligent or only secondarily negligent. But the District Court concluded that the situation involved in *Quinones* was one of concurrent, active, primary negligence on the part of the Township and McCabe, and therefore held that the contract could not be interpreted to permit indemnity in those circumstances in light of that conclusion. The Third Circuit applied the same interpretation of the contract as the District Court, but found McCabe primarily negligent and the Township secondarily negligent, and therefore permitted a recovery of indemnity under the contract. It is quite evident, therefore, that the finding of primary and secondary negligence was essential in permitting a recovery of indemnity even under the contract because of the absence of clear contractual intent to cover concurrent active negligence. Thus the Third Circuit was required to make the identical determination which would have been necessary in the absence of any contrac-

tual provision to permit recovery of indemnity. This Court therefore regards the *Quinones* decision as controlling on this point in the case at bar, and believes that the Government is entitled to indemnity from Berks.

## D. GOVERNMENT v. BREWSTER and BREWSTER v. LEWIS

The defendant Government in this case hired Brewster as general contractor to undertake and oversee the construction of the Dam here involved. The contract awarded to Brewster for the complete construction was designated as Contract No. DA–18–020–CIVENG–59–34 and provided that the work was to be done in strict accordance with the specifications, drawings, and conditions, all of which were made part of the contract as set forth in "Specifications No. CIVENG–18–020–59–8". These specifications provided in relevant part as follows:

GC–16. ACCIDENT PREVENTION:

*a.* In order to provide safety controls for protection to the life and health of employees and other persons; for prevention of damage to property, material, supplies, and equipment; and for avoidance of work interruptions in the performance of this contract; the Contractor will comply with all pertinent provisions of Corps of Engineers manual, EM 385–1–1, dated 13 March 1958, entitled "General Safety Requirements", as amended, and will also take or cause to be taken such additional measures as the Contracting Officer may determine to be reasonably necessary for the purpose.

*b.* Prior to commencement of the work the Contractor will—

(1) Submit in writing his proposals for effectuating this provision for Accident Prevention.

(2) Meet in conference with representative of the Contracting Officer to discuss and develop mutual understanding relative to administration of the over-all safety program.

*c.* During the performance of work under the contract, the Contractor shall comply with all procedures prescribed by the Contracting Officer for the control and safety of persons visiting the job site and will comply with such requirements to prevent accidents as may be specified under the Special Conditions of these specifications or issued by the Contracting Officer.

*d.* The Contractor will maintain an accurate record of, and will report to the Contracting Officer in the manner and on the forms prescribed by the Contracting Officer, exposure data and all accidents resulting in death, traumatic injury, occupational disease, and/or damage to property, materials, supplies and equipment incident to work performed under this contract.

*e.* The Contracting Officer will notify the Contractor of any noncompliance with the foregoing provisions and the action to be taken. The Contractor shall, after receipt of such notice, immediately take corrective action. Such notice, when delivered to the Contractor or his representative at the site of the work, shall be deemed sufficient for the purpose. If the Contractor fails or refuses to comply promptly, the Contracting Officer may issue an order stopping all or part of the work until satisfactory corrective action has been taken. No part of the time lost due to any such stop order shall be made the subject of claim for extension of time or for excess costs or damages by the Contractor.

*f.* Compliance with the provisions of this article by subcontractors will be the responsibility of the Contractor.

The Contract form DA–18–020–CIVENG–59–34 itself provided:

GP–11. PERMITS AND RESPONSIBILITY FOR WORK, ETC.

The Contractor shall, without additional expense to the Government, obtain all licenses and permits required

for the prosecution of the work. He shall be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work. He shall also be responsible for all materials delivered and work performed until completion and final acceptance, except for any completed unit thereof which theretofore may have been finally accepted.

The safety manual referred to in GC–16 provided in relevant part, as follows:

1–1. Each employee shall be provided initial indoctrination and such continuing instruction as will enable him to conduct his work in a safe manner.

The Government contends that if it is liable in this case to plaintiff as a result of a dangerous condition or practice, then such liability is due in the first instance to the failure of Berks to properly instruct its employees in the safe manner of moving within the forms and of the danger of standing upon spreaders, and in the second instance by the negligence of Brewster in its failure to obtain compliance by Berks with provision 1–1 and other provisions of the safety manual. Among other remedies, the Government therefore claims that it is entitled to indemnity from Brewster under provision GP–11 for any damages which the Government is called upon to pay plaintiff.

The Court agrees with the Government. Brewster obligated itself in GC–16a. to comply with all pertinent provisions of the safety manual and in GP–16f. to secure compliance with those provisions by subcontractors. Under those circumstances, Brewster could not free itself of its responsibility to the Government of securing Berks' compliance by contracting with Lewis. It could, of course, protect itself against the consequences of such noncompliance by requiring similar indemnification from Lewis. And in the instant case it did just that by inserting in its contract with Lewis the following provision:

10. INDEMNITY. Notwithstanding the requirements for insurance, to be affected [sic] by Subcontractor under paragraph 11 hereof, Subcontractor agrees in connection with its work to adequately and properly protect its work by lights, barriers, supports and guards and to conduct and carry on its work in such manner as to avoid injury or damage to persons or property including its own work and be strictly responsible for damage to persons or property by failure so to do by Subcontractor's negligence, and shall assume as to its work hereunder all obligations imposed on Contractor under the provisions of the General Contract and shall indemnify and hold harmless Contractor and the Owner against such obligations in the same manner that contractor is obligated to indemnify Owner.

The Court believes that it was the intent of these provisions that Brewster be obligated to indemnify the Government if it negligently failed to secure compliance with the provisions of the safety manual and that Lewis be obligated to indemnify Brewster in the same manner. Since such indemnity provisions are undoubtedly valid in Pennsylvania, the Court holds that Brewster is obligated to indemnify the Government, and Lewis to indemnify Brewster, for any damages the former parties are called upon to pay in this case.

It is true that in Pennsylvania indemnity provisions will not be held to protect an indemnitee who is negligent when his indemnitor is not negligent, or an indemnitee who is primarily and actively negligent when his indemnitor is only secondarily or passively negligent, unless the intent to so protect the indemnitee is clearly shown in the contract. Perry v. Payne, 217 Pa. 252, 66 A. 553 (1907); Quinones v. Township of Upper Moreland, 187 F.Supp. 260 (E.D.Pa. 1960), reversed on other grounds 293 F.2d 237 (3rd Cir. 1961) (supra).

The policy behind this rule is that such a construction would put the indemnitor at the mercy of the indemni-

tee's negligence. Perry v. Payne, *supra* and Quinones v. Township of Upper Moreland, *supra*. But assuming, without deciding, that no such clear intent is shown in the above provisions, the Court does not believe that rule is applicable on Brewster's behalf here, as against the Government. For, as is indicated in another portion of this discussion, the primarily and actively negligent party in this case is not the Government, but Berks. Nor would the policy behind the rule support its application in favor of Brewster here. For the provision as the Court interprets it puts Brewster in the first instance not at the mercy of the Government's negligence, but at the mercy of Berks' negligence, and of its own negligence in failing to secure compliance by Berks with the safety provisions. And it was just such failure to perform properly by Berks for which Brewster explicitly agreed to take responsibility in GC–16f. The fact that the Government may also have been secondarily negligent in failing to warn or otherwise protect plaintiff of the hazard so created does not relieve Brewster of its contractual responsibility. Similarly, Lewis cannot be relieved of its responsibility, which it explicitly assumed, to meet all obligations as to its portion of the work which the Government in the prime contract required of Brewster. The terms of the original contract, including the specifications referring to the provisions of the safety manual, were specifically incorporated in the Brewster-Lewis contract, and the above quoted indemnity provision clearly made it liable for its failure to secure compliance with those provisions.

 Furthermore, though the parties have based their contentions with respect to the indemnity provision in the prime contract on Pennsylvania law, there is substantial authority for the proposition that express indemnity provisions in Government contracts should be construed according to Federal law. Guy F. Atkinson Co. v. Merritt, Chapman & Scott Corp., 141 F.Supp. 833 (N.D.Cal. 1956); Maloof v. United States, 242 F.Supp. 175 (D.Md.1965). Indemnity provisions are not repugnant to the Federal Tort Claims Act, and are more liberally construed than under Pennsylvania law in situations where the indemnitee is itself negligent, Guy F. Atkinson, *supra* 141 F.Supp. at 837; Maloof, *supra*, 242 F.Supp. at 185. The result permitting indemnity here is therefore even clearer under Federal law than under state law, and it is not necessary to decide which is applicable.

## E. LEWIS v. BERKS

Lewis contends that it is entitled to recover indemnity against Berks for any damages it is called upon to pay on three grounds:

(a) Express contractual indemnity based on the contractual arrangement between Lewis and Berks;

(b) Common law indemnity, based on the doctrine of primary and secondary negligence;

(c) Indemnity based on Berks' breach of a contractual warranty of workmanlike performance of its subcontract.

 The Court does not believe that Lewis is entitled to express contractual indemnity from Berks. After accepting from Brewster on September 4, 1959, a subcontract to perform certain concrete work at the Dam site, Lewis issued its purchase order No. G–112–14 under date of December 14, 1959 to Berks. The order charged Berks to furnish all necessary labor, tools, equipment and insurance required in connection with the placement of certain reinforcing steel for the concrete work:

"In accordance with the existing plans and specifications and in compliance with all labor standards and non-discrimination clauses in general and special provisions of Government Contract No. DA–18–020–CIVENG–59–34," [i. e. the prime contract between the Government and Brewster].

Lewis attached to the purchase order copies of certain labor standard and non-discrimination clauses found in the gen-

eral and special provisions of the prime contract, but, in contrast, did not attach any indemnity provision whatsoever. Nor did the purchase order make any reference to any indemnity provision. Nevertheless, Lewis contends that Berks, by agreeing to do the work in accordance with the existing plans and specifications of the prime contract became bound by the indemnity provision (quoted in full in Part D of this discussion) of that contract.

 It is the law of Pennsylvania that indemnification agreements are to be construed strictly with every intendment against the party seeking their protection. Brown v. Moore, 247 F.2d 711, 69 A.L.R.2d 288 (3rd Cir. 1957); Schroeder v. Gulf Refining Co. (No. 2), 300 Pa. 405, 150 A. 665 (1930). Lewis drew the purchase order and could easily have inserted an indemnity provision if it so wished. See Pittsburgh Steel Co. v. Patterson-Emerson-Comstock, Inc., 404 Pa. 53, 171 A.2d 185 (1961); Brotherton Construction Co. v. Patterson-Emerson-Comstock, Inc., 406 Pa. 400, 178 A.2d 696 (1962). It is worthy of note in this connection that Brewster did insert an express indemnity provision in its contract with Lewis. Furthermore, even if plans and specifications of a prime contract are made a part of a subcontract, a subcontractor is bound only by those parts clearly applicable to his subcontract, and only to the extent and for the purposes these are made a part of the subcontract. The Court is of the opinion that the view expressed by the United States Supreme Court in Guerini Stone Co. v. P. J. Carlin Const. Co., 240 U.S. 264, 36 S.Ct. 300, 60 L.Ed. 636 (1916) is equally applicable and appropriate here:

"The reference in the subcontract to the drawings and specifications was evidently for the mere purpose of indicating what work was to be done, and in what manner done, by the subcontractor. Notwithstanding occasional expressions of a different view, in our opinion the true rule, based upon sound reason and supported by the greater weight of authority, is that in the case of subcontracts, as in other cases of express agreements in writing, a reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified." Id. at 277, 36 S.Ct. at 306 (citations omitted).

The Court does not believe that the purchase order incorporated any express indemnity provision.

Apparently recognizing the weakness of any argument based on the purchase order, Lewis argues at some length that this order was never intended to encompass the entire agreement between Lewis and Berks, and that the full agreement between parties in such a situation often goes beyond the scope of a written purchase order. However, Lewis offered no evidence whatsoever at trial of any further agreement between the parties by which Berks agreed to indemnify Lewis, and consequently this argument is of no value to Lewis under the facts of the instant case. Consequently, the Court concludes that Berks made no express contractual agreement to indemnify Lewis.

 Lewis is, however, entitled to common law indemnity against Berks on the basis that Berks was the primarily negligent party and Lewis only secondarily negligent. The law in this area has been covered in the previous consideration of the Government's right to indemnity against Berks, and the Court does not intend to lengthen this already extended discussion by repeating that discussion here. And Lewis' argument for indemnity is at least as strong as that of the Government. For the possibility of any active or primary negligence on the part of Lewis was virtually stipulated away by the parties. It is true that Lewis did have the function of placing the spreaders inside the concrete forms. But the parties have stipulated in stipulation G–12 that Lewis was following the usual and customary practices of the construction industry in its manner of handling and inserting the spreaders and that its use of spreaders in such

manner was in all ways proper. Nor was any evidence whatsoever of any negligence of Lewis in the above-described operations presented at trial. The only negligence of Lewis was its failure to see that the safety provisions of the prime contract incorporated by reference in its contract with Brewster were complied with by Berks. But Berks, in failing to instruct its own inexperienced employee in the safe and proper manner of conducting his work, was the primarily negligent party, as has been indicated previously. And it does not help Berks, in this connection, to argue that Lewis failed to include a provision to this effect in the contractual relationship between Lewis and Berks, because such instruction of inexperienced employees is undoubtedly the obligation of any employer regardless of contract. Since, then, Lewis was only secondarily negligent and Berks primarily negligent, Lewis is entitled to common law indemnity against Berks. Furthermore, since any subcontractor who employs inexperienced workmen in performing the subcontract has an obligation to instruct them in the safe and proper manner of conducting their work, Berks' failure to do so also constituted a breach of its implied warranty of workmanlike performance of its subcontract entitling Lewis to recover indemnity on that basis as well. See Ryan Stevedoring Co., Inc. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956).

## F. BREWSTER v. BERKS

■ Brewster contended in its pretrial memorandum that it was entitled to indemnity from Berks for basically the same reasons which have been discussed above in connection with Lewis' claim for indemnity against Berks, but did not press at trial orally or by brief a claim for express contractual indemnity against Berks. In any event, Brewster is not entitled to express contractual indemnity from Berks for the same reasons discussed in connection with Lewis' similar claim, and possibly for other reasons arising from the fact that there was no direct contractual relationship with Berks. Brewster is, however, entitled to common law indemnity from Berks because of Berks' primary negligence for basically the same reasons set forth in connection with Lewis' corresponding claim. Whether Brewster is also entitled to recovery of indemnity from Berks on the basis of an implied warranty of workmanlike performance in a non-admiralty situation in the absence of a direct contractual relationship between them is a difficult question unnecessary to the decision of this case on which the Court expresses no opinion. See, however, in this connection, Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959).

## G. EXTENT OF BERKS' LIABILITY TO THE GOVERNMENT, BREWSTER AND LEWIS

Berks contends that even if it is held liable to indemnify the other defendants, the Government, Brewster and Lewis, in this case, its liability in indemnity is limited to its liability to plaintiff under the Pennsylvania Workmen's Compensation Act. The other defendants claim that they can recover from Berks the full amount of the verdict if they are called upon to pay it.

The only case which has been called to the attention of the Court, or which the Court has been able to discover, dealing with the question of whether, under Pennsylvania law, such recovery in indemnity against an employer is limited to, or can exceed the employer's direct liability to the plaintiff under the Workmen's Compensation Act is Quinones v. Township of Upper Moreland, 293 F.2d 237 (3rd Cir. 1961), discussed in detail earlier. But, as has been indicated previously, that case is not controlling here on the issue of the extent of Berks' liability. It is true that the Court's finding of primary and secondary negligence was essential to the decision in that case, and was the same finding which would have to be made to permit indemnity as opposed to contribution in the absence of an express contractual indemnity pro-

vision. But the reason such a finding was necessary, as this Court reads the *Quinones* decision, was not to allow recovery on the basis of common law indemnity, though that result could have been justified on the basis of this finding as well, but in order to permit recovery *under the contract as the court interpreted it.* For, as has been indicated in the previous discussion, because there was no clearly expressed intention to indemnify in the case of concurrent negligence, the intention of the parties must, under Pennsylvania law, be interpreted to cover only the situation in which the indemnitor was primarily or solely negligent. And that court, in allowing recovery to exceed the indemnitor-employer's Workmen's Compensation liability, was relying on the fact that there was a contractual provision pursuant to which indemnity was being allowed. This is what this Court believes to be the import of the court's language when it said, after determining that McCabe's liability was primary and the Township's secondary:

> " * * * and accordingly, under the indemnity provisions of the contract between the parties, Township is entitled to a judgment of indemnity against McCabe in its third-party action *to the full extent of plaintiff's verdict against Township.*" 293 F.2d at 242–243 (emphasis added).

Furthermore, this Court believes it is evident that the Third Circuit was treating the matter as one of express contract, because, in contrast to its detailed discussion of primary and secondary liability, the court merely stated its conclusion on this issue. In the absence of express contract, the issue would have been an open and difficult one; but the existence of an express indemnity contract has been considered to be the clearest case, and the one unanimously agreed upon, for allowing full recovery despite the exclusive remedy provision of Workmen's Compensation statutes. Note, 42 Va.L.Rev. 959, 969 (1956) and cases cited therein; 2 Larson, Workmen's Compensation 76.41 (1961 ed.).

At one end of the spectrum, then, is the express contract of indemnity where the employer has agreed to indemnify another party for the very kind of loss or injury to the employee which has resulted in payment of damages by the other party. There the law is clear that the exclusive remedy provisions of the Workmen's Compensation Act are not a bar to, or limit on recovery. Quinones v. Township of Upper Moreland, *supra.* At the other end of the spectrum is the situation in which the other party's right to recovery against the negligent employer is only one of contribution and not one of indemnity. Here again the law is clear. The other party may recover contribution from the employer, but that recovery is limited to the amount of the employer's liability to his employee under the Workmen's Compensation Act. Maio v. Fahs, 339 Pa. 180, 14 A.2d 105 (1940). But, like the situation of the express contract of indemnity, the situation in which only contribution is involved differs substantially from that here involved (though confusion between indemnity and contribution is not uncommon), and the *Maio* case is therefore not controlling here. Litwinowicz v. Weyerhaeuser Steamship Co., 179 F.Supp. 812, 820 (E.D.Pa.1959) (dictum); see Union Stockyards Co. of Omaha v. Chicago B. & O. R. Co., 196 U.S. 217, 25 S.Ct. 226, 49 L.Ed. 453 (1905); Ryan Stevedoring Co., Inc. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956); 2 Larson, Workmen's Compensation § 76 (1961 ed.); Note, 42 Va.L.Rev. 959 (1956). But between the two ends of the spectrum, in the area into which this case falls, there is no Pennsylvania case or authority in point.

Nor is there any significant help in the wording of the statute. It is, perhaps, worthwhile noting, that in Pennsylvania the Workmen's Compensation statute is treated as a contractual arrangement between employer and employee which would therefore not appear by its language to bind third parties in their attempts to recover against the

employer, though it would provide the exclusive remedy of the employee against the employer. 77 P.S. §§ 1 et seq., 431, 481. However, to rely on such language, as has been pointed out by one commentator on this subject, is in reality to speculate about legislative intention on the strength of statutory language in framing which the legislators had not the remotest idea of the present question in their minds. 2 Larson, Workmen's Compensation 76.53 (1961 ed.). And it is noteworthy in this regard that the wording of the statutes in other states has not, in general, been decisive in determining their application with respect to the rights of third parties against the employer. Note, 42 Va.L.Rev. 959, 963 (1956). The present question, as the commentators agree, is really one best resolved by legislative determination, because of the substantial and conflicting policies involved. 2 Larson, Workmen's Compensation 76.53 (1961 ed.); Note, 42 Va.L.Rev. 959, 976 (1956). But when faced with the necessity of deciding this question, in the absence of such determination, this Court believes that it is better to consider those policy considerations (as set forth below) squarely than to engage in speculation as to legislative intent.

It is evident from a policy standpoint that a significant argument can be made on behalf of the employer against permitting a secondarily negligent party to recover full indemnity from a primarily negligent employer without limiting recovery to the latter's Workmen's Compensation liability where the damages sought to be recovered arise out of an injury to the latter's employee. For it can be argued that to permit the employee to recover against the secondarily negligent third party, and then to permit that party to recover over the full amount against the employer in indemnity, in the absence of express agreement to that effect, is to accomplish indirectly what the statute prevents from being accomplished directly. But this Court finds considerably more persuasive the following reply to that argument by one of the leading commentators in the Workmen's Compensation area:

"The phrase most frequently heard in arguments against such recovery-over is this: the allowance of such recovery-over accomplishes indirectly what cannot be done directly, and therefore evades the spirit of the legislation. This is not entirely accurate, for it does not tell the whole story. True, the end result is, as indicated above, that a common-law-size recovery proceeds from the employer to the employee; but in the process two things are accomplished, one of which is relevant to the purposes of the compensation provision and the other of which is independent of it. The relevant accomplishment is that of preserving the employee's common-law rights against negligent outsiders. This having been done, there still remains the job of adjusting rights fairly between the outsider and the negligent employer. The question here becomes very precise; did the compensation acts, in conferring immunity on the employer from common-law suits, mean to do so only at the expense of the injured employee, or also at the expense of outsiders? One answer is that the injured employee got *quid pro quo*, in receiving assured compensation payments as a substitute for tort recoveries, while the third party has received absolutely nothing, and hence should not be impliedly held to have given up rights which he had before. It is unfair to pull the third party within the principle of mutual sacrifice when his part is to be all sacrifice and no corresponding gain." 2 Larson, Workmen's Compensation 76.52 (1961 ed.).

In the instant case, plaintiff's recovery against the Government reflects the preservation of his right against that outsider, negligent as a possessor of land who failed to warn or otherwise protect plaintiff from an unreasonable risk of harm. And it would be unjust to hold that the Government, which gets no significant benefit from the Workmen's

Compensation arrangement here involved once it is found negligent, is limited in its recovery-over against Berks. Similarly Lewis, negligent in failing to meet its obligation to secure compliance with the safety provisions of the main contract by Berks, gets no immunity or significant benefit from the Workmen's Compensation arrangement here, and should not be limited in its recovery against Berks to the latter's Workmen's Compensation liability to plaintiff. Accordingly the Court holds that the Government and Lewis are entitled to full indemnity against Berks without any limit arising from the Workmen's Compensation Act.

■ It should be noted that cases in other jurisdictions or admiralty, some of which are cited by the parties for holdings contrary in whole or part to the above, have little or no bearing on the determination of the issue here. That Pennsylvania law in the general area of recovery of indemnity and contribution against an employer is substantially different from that of other jurisdictions is evident even from cursory consideration of the authorities. For example, while it is true that Pennsylvania limits recovery of *contribution* against an employer to the employer's Workmen's Compensation liability, it is also true that Pennsylvania is unique in permitting any recovery of contribution against an employer, though one other state does reach the same result by another route. Note, 42 Va.L.Rev. 959, 966 (1956). It is also worth noting, in a somewhat related area, that Pennsylvania is unique in permitting a third party sued by one spouse for personal injuries to recover contribution or indemnity against the other spouse, even though the latter is immune from direct suit by the plaintiff spouse. Fisher v. Diehl, 156 Pa.Super. 476, 40 A.2d 912 (1945); Koontz v. Messer and Quaker State Oil Refining Co., 320 Pa. 487, 181 A. 792 (1935); Note, 42 Va.L. Rev. 959, 967 (1956). And the fact that even states within the ambit of the Third Circuit have not only differing results but differing policies in this area is reflected in the excellent discussion in Elston v. Industrial Lift Truck Co., 420 Pa. 97, 216 A.2d 318 (1966).

The disposition of the question of the extent of Berks' liability to Brewster in indemnity is more complicated than that of similar questions with regard to Lewis and the Government. The problem arises because there are certain circumstances under the Pennsylvania Workmen's Compensation Act in which the prime contractor can become immune to liability in a tort action at common law for an injury to an employee of a subcontractor even though it is the plaintiff's immediate employer (subcontractor) and not the prime contractor who pays Workmen's Compensation benefits to the plaintiff. On this basis it could be argued that the prime contractor does derive a substantial benefit from the statutorily imposed contractual-type arrangement between the plaintiff and his immediate employer without furnishing consideration and therefore that the argument that he had received no *quid pro quo* for limiting his recovery over is inappropriate.

■ The circumstances referred to arise as follows. Under the Pennsylvania Act, when certain conditions are met, the prime contractor can become a "statutory employer", responsible for providing Workmen's Compensation coverage for an employee of a subcontractor but immune from common law tort suits just as the immediate employer ordinarily would be. 77 P.S. §§ 52, 462. These requirements for putting a contractor in the position ordinarily occupied by the immediate employer by making him a statutory employer are: (1) that he be under contract with an owner or one in the position of an owner; (2) that he occupy or control premises of the owner; (3) that he enter into a subcontract; (4) that he entrust part of his regular business to the subcontractor; (5) that the injured plaintiff be an employee of the subcontractor. 77 P.S. § 52; McSparran v. Hanigan, 225 F.Supp. 628 (E.D.Pa. 1963); McDonald v. Levinson Steel Co., 302 Pa. 287, 153 A. 424 (1930). The

prime contractor can be held responsible for Workmen's Compensation coverage for, and immune from tort suit by, the employee of a second subcontractor, or subcontractor of his immediate subcontractor, on this basis as well. Qualp v. James Stewart Co., 266 Pa. 502, 109 A. 780 (1920). The purpose of these provisions was to benefit the injured workman by definitely fixing some responsible party with the obligation of paying Workmen's Compensation, and picked the first in succession from the owner on the belief that the owner would be likely to contract only with responsible parties. *Id.* at 509, 109 A. 780. Where the prime contractor becomes so obligated, the usual Workmen's Compensation arrangement does not hold between the employee and his immediate employer unless the prime contractor and immediate employer so agree. 77 P.S. § 462. However, providing the prime contractor does not reject the Workmen's Compensation Act, if the actual employer does agree to provide Workmen's Compensation coverage, the prime contractor remains free from tort liability to the injured workman. Moore v. Philadelphia Electric Company, 189 F.Supp. 808 (E.D.Pa.1960); Byrne v. Henry A. Hitner's Sons Co., 290 Pa. 225, 138 A. 826 (1927). And if under these circumstances both prime contractor and immediate employer provide Workmen's Compensation coverage, it is the latter who is obligated to make payment if able. Byrne v. Hitner's Sons Co., *supra.* It is these situations which give rise to the impression that the prime contractor gets a benefit from the arrangement between subcontractor and the latter's employee without furnishing consideration.

█ Actually, however, the prime contractor gets such benefit only if he accepts a corresponding burden, and consequently this Court cannot conclude that such a benefit could constitute a *quid pro quo* for limiting the prime contractor's recovery over. For, in the first place, the prime contractor must accept (not reject) the Act. Gallivan v. Wark Co., 288 Pa. 443, 136 A. 223 (1927). Secondly,

the prime contractor must obtain an agreement from the employer or an intermediate subcontractor to furnish compensation or to see that it is furnished, for which he presumably must give consideration. In the instant case, Brewster did just that through its contract with Lewis (Exhibit G–10, § 11–a). Third, the prime contractor, in accordance with the purpose of the statutory provision, must pay the Workmen's Compensation liability if the party agreeing to provide the protection cannot pay. Byrne v. Hitner's Sons Co., *supra.* Thus Brewster benefits from the Workmen's Compensation arrangement between Berks and plaintiff only by undertaking certain burdens and furnishing certain consideration itself. Therefore, assuming as Berks asserts in its suggested findings that Brewster is a statutory employer in this case, the Court does not believe that this situation alters the basic policy considerations previously discussed for permitting recovery of full indemnity against Berks. Accordingly, the Court holds that Brewster's recovery against Berks is not limited to the latter's Workmen's Compensation liability to plaintiff.

### CONCLUSIONS OF LAW

█ 1. A possessor of land is liable for physical harm caused to his invitees by a condition on the land if he (a) knows or by exercise of reasonable care would discover the condition and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should expect that they will not discover or realize the danger, or fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger. Restatement (Second) Torts § 343 (1965).

█ 2. A possessor of land who permits third persons to conduct an activity on his land is under a duty of care to keep the third party's conduct from creating an unreasonable risk of bodily harm to others, if the landowner (a) knows or has reason to know that he has the ability to control the third person,

and (b) knows or should know of the necessity and opportunity for exercising such control. Restatement (Second) Torts § 318 (1965).

3. Plaintiff was a business invitee on the United States' property.

4. Plaintiff was injured because of the United States' failure to protect him against the danger that existed on land owned by and in the possession of the United States.

5. The United States was negligent by its failure to warn plaintiff of the danger of walking on spreaders.

6. The United States retained and exercised a substantial element of control over those on the job site in many safety matters.

7. The United States had a duty to plaintiff to prevent the contractors' employees' activities on the land from creating an unreasonable risk of harm to him.

8. The United States breached its duty to plaintiff when it failed to exercise its control over other workmen to stop their practice of walking on the spreaders, which conduct in fact created an unreasonable risk of harm to plaintiff, who would reasonably assume from this practice that the spreaders were safe to stand and walk upon.

9. Plaintiff was in no way contributorily negligent by his actions, since in light of his limited background in the type of work involved he acted as a reasonable man unaware of the existing danger in walking on the spreaders.

10. Plaintiff did not assume the risk of an accident like that here involved, because he was unaware and could not be expected to be aware of the danger of stepping upon spreaders, and the danger was not obvious.

11. Failing to indoctrinate the plaintiff in the safe manner of performing his work or cause the subcontractors to do so was a breach of Brewster's contract with the defendant United States.

12. The failure of Brewster to supervise the plaintiff in the progress of his work or to secure adequate supervision by Berks during the time he was working on the job until the time of the accident was fault and negligence within the meaning of the indemnity provision of Brewster's contract with the defendant and this fault proximately caused plaintiff's accident and injury.

13. The defendant United States' negligence in this action arose out of its failure to discover the negligence on the part of others and such negligence was passive and secondary.

14. Brewster is entitled to indemnity from Lewis pursuant to the indemnity provision of the written contract between Brewster and Lewis for any damages it is called upon to pay any other party.

15. Brewster's negligence was only of a secondary character, in that it failed to secure compliance by Berks with the safety provisions of the prime contract when the latter failed to instruct plaintiff in the safe and proper manner of conducting his work.

16. The liability of Lewis in this case is in the nature of secondary liability in that Lewis, although without active fault on its own part, has incurred liability as a result of a legal obligation arising out of the provisions of the Brewster-Lewis Contract and out of its secondary negligence in failing to see that plaintiff was properly instructed by Berks in the safe and proper manner of carrying out and in failing thereby to secure compliance with the safety provisions of the main contract.

17. The failure of Charles Varner, Berks' foreman, to warn the plaintiff that the spreaders, and particularly the spreader from which plaintiff fell, were not secured within the form so as to enable them safely to bear the weight of a man from above proximately caused plaintiff's accident and injury. Such failure constituted primary and active negligence on the part of Berks.

18. The third party defendant, Berks Steel Service, Inc., by virtue of the fact that its active and primary negligence proximately caused the plaintiff's in-

**34**

juries and damages which are the subject matter of his action against the United States, is liable under the common law of the State of Pennsylvania to indemnify the United States of America with respect to its liability arising out of the plaintiff's action against the United States. Quinones v. Township of Upper Moreland, 293 F.2d 237 (3rd Cir. 1961).

19. The Court finds in favor of Brewster and Lewis on their respective claims against Berks for common law indemnity pursuant to the law of Pennsylvania. Quinones v. Township of Upper Moreland, 293 F.2d 237 (3rd Cir. 1961).

20. Berks failed to perform its work in a safe, proper and workman-like manner.

21. Berks breached the implied term of the Lewis-Berks Contract, whereby Berks agreed to perform the work called for by that contract in a safe, proper and workman-like manner by failing to warn the plaintiff that spreaders, as used in this type construction, could not safely bear the weight a man applied from above.

22. The Court finds in favor of Lewis against Berks on Lewis' claim against Berks for indemnity pursuant to the implied term in the Lewis-Berks Contract, whereby Berks agreed to perform the work which was the subject matter of the contract in a safe, proper and workman-like manner.

23. The liability of Berks to the United States, to Brewster, and to Lewis for indemnity is not limited by the terms of the Workmen's Compensation Act but rather the United States, Brewster, and Lewis are entitled to full indemnity from Berks for all sums which they are required to pay to any other party.

24. Each defendant is entitled to recover from any defendant which this Court has found obligated to indemnify it, all of its costs, including a reasonable counsel fee, which arises from the defense of claims brought against it in this case. The Court reaches this conclusion notwithstanding the holding in Rohm & Haas Co. & Lessner, 168 Pa. Super. 242, 77 A.2d 675 (1951). This case has never been cited or followed in any subsequent decisions with respect to this point. A defendant is entitled to recover these costs regardless of whether the obligation to indemnify it is based on express or implied contract or on a theory of common law indemnity. Orth v. Consumers' Gas Co., 280 Pa. 118, 124 A. 296 (1924).

25. No defendant is entitled to recover its costs in prosecuting its claims in this case against another defendant either from that defendant or from any other defendant. See United States Lines Company v. E. J. Lavino & Co., 198 F.Supp. 483 (E.D.Pa. 1961); Frommeyer v. L. & R. Construction Co., 261 F.2d 879, 69 A.L.R.2d 1040 (3rd Cir. 1958).

26. Any defendant required to pay to another defendant the latter's costs, can in turn recover those costs from any defendant obligated to indemnify it. Furthermore, H. I. Lewis Construction Co., Inc. is entitled to recover from Berks Steel Service, Inc. any costs of the United States of America which H. I. Lewis Construction Company is required to pay to George M. Brewster & Son, Inc. as a result of this paragraph.

And now, to wit, this 23rd day of April A.D. 1969, in accordance with the above Findings of Fact, Conclusions of Law and Discussion, the following Judgment is entered.

### JUDGMENT

1. Judgment is entered in favor of the plaintiff, Robert A. Fisher, against the defendant, United States of America, in the sum of $110,280.36 less the amount of medical expenses and Workmen's Compensation payments paid by the employer, Berks Steel Service, Inc., to the date that judgment against the United States of America is paid.

2. Judgment is entered in favor of the United States of America against George M. Brewster & Son, Inc. in the amount of the judgment entered in favor of the plaintiff, Robert A. Fisher,

against the defendant, United States of America, as stated in Paragraph 1 hereof, subject to the limitation of Paragraph 7 below.

3. Judgment is entered in favor of the United States of America against Berks Steel Service, Inc., in the amount of the judgment entered in favor of the plaintiff, Robert A. Fisher, against the defendant, United States of America, as stated in Paragraph 1 hereof, subject to the limitation of Paragraph 7 below.

4. Judgment is entered in favor of George M. Brewster & Son, Inc. against H. I. Lewis Construction Co., Inc. in the amount of the judgment paid by George M. Brewster & Son, Inc. to the United States pursuant to Paragraph 2 above, subject to the limitation of Paragraph 8 below.

5. Judgment is entered in favor of George M. Brewster & Son, Inc. against Berks Steel Service, Inc. in the amount of the judgment paid by George M. Brewster & Son, Inc. to the United States of America pursuant to Paragraph 2 above, subject to the limitation of Paragraph 8 below.

6. Judgment is entered in favor of H. I. Lewis Construction Co., Inc. against Berks Steel Service, Inc. in the amount of the judgment paid by H. I. Lewis Construction Co., Inc. to George M. Brewster & Son, Inc. pursuant to Paragraph 4 above.

7. Provided, however, that the United States of America shall not under any circumstances recover under Paragraphs 2 and 3 above more than the amount of the judgment entered under Paragraph 1 above in favor of the plaintiff, Robert A. Fisher, and against the defendant, United States of America.

8. Provided, however, that George M. Brewster & Son, Inc. shall not under any circumstances recover under Paragraphs 4 and 5 above more than the amount of the judgment paid by George M. Brewster & Son, Inc. to the United States of America pursuant to Paragraph 2 above.

9. In addition to the judgments heretofore entered, judgment is also entered in favor of the United States of America against George M. Brewster & Son, Inc. for its costs in defending plaintiff's action, including a reasonable counsel fee, subject to the limitation of Paragraph 14 below. The United States of America is not entitled to recover against George M. Brewster & Son, Inc. costs or counsel fees arising from prosecution of its claims against George M. Brewster & Son, Inc. or Berks Steel Service, Inc.

10. In addition to the judgments heretofore entered, judgment is also entered in favor of the United States of America against Berks Steel Service, Inc. for its costs in defending plaintiff's action, including a reasonable counsel fee, subject to the limitation of Paragraph 14 below. The United States of America is not entitled to recover from Berks Steel Service, Inc. costs or counsel fees arising from the prosecution of its claims against George M. Brewster & Son, Inc. or Berks Steel Service, Inc.

11. In addition to the judgments heretofore entered, judgment is also entered in favor of George M. Brewster & Son, Inc. against H. I. Lewis Construction Co., Inc. for its costs in defense of the claim of the United States of America against it, including a reasonable counsel fee, subject to the limitation of Paragraph 15 below. George M. Brewster & Son, Inc. is not entitled to recover from H. I. Lewis Construction Co., Inc. costs or counsel fees arising from the prosecution of its claims against H. I. Lewis Construction Co., Inc. or Berks Steel Service, Inc.

12. In addition to the judgments heretofore entered, judgment is also entered in favor of George M. Brewster & Son, Inc. against Berks Steel Service, Inc. for its costs in defense of the claim of the United States of America against it, including a reasonable counsel fee, subject to the limitation of Paragraph 15 below. George M. Brewster & Son, Inc. is not entitled to recover from Berks Steel Service, Inc. costs or counsel fees arising from the prosecution of its claims against H. I. Lewis Construction Co., Inc. or Berks Steel Service, Inc.

13. In addition to the judgments heretofore entered, judgment is also entered in favor of H. I. Lewis Construction Co., Inc. against Berks Steel Service, Inc. for its costs in defense of the claim of George M. Brewster & Son, Inc. against it, including a reasonable counsel fee. H. I. Lewis Construction Co., Inc. is not entitled to recover from Berks Steel Service, Inc. costs or counsel fees arising from the prosecution of its claim against Berks Steel Service, Inc.

14. Provided, however, that the United States of America shall not under any circumstances recover under Paragraphs 9 and 10 above more than its costs in defending plaintiff's action, including a reasonable counsel fee.

15. Provided, however, that George M. Brewster & Son, Inc. shall not under any circumstances recover under Paragraphs 11 and 12 above more than the amount of its costs in defense of the claim of the United States of America against it, including a reasonable counsel fee.

16. In addition to the judgments heretofore entered, judgment is also entered in favor of George M. Brewster & Son, Inc. against H. I. Lewis Construction Co., Inc. for the amount paid by George M. Brewster & Son, Inc. to the United States of America under Paragraph 9 above, subject to the limitation of Paragraph 18 below.

17. In addition to the judgments heretofore entered, judgment is also entered in favor of George M. Brewster & Son, Inc. against Berks Steel Service, Inc. for the amount paid by George M. Brewster & Son, Inc. to the United States of America under Paragraph 9 above, subject to the limitation of Paragraph 18 below.

18. Provided, however, that George M. Brewster & Son, Inc. shall not under any circumstances recover under Paragraphs 16 and 17 above more than the amount paid by George M. Brewster & Son, Inc. to the United States of America under Paragraph 9 above.

19. In addition to the judgments heretofore entered, judgment is also entered in favor of H. I. Lewis Construction Co., Inc. against Berks Steel Service, Inc. for the amount paid by H. I. Lewis Construction Co., Inc. to George M. Brewster & Son, Inc. under Paragraphs 11 and 16 above.

And it is so ordered.